J-S23037-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF: WILHELM G. ROSCHER, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ANNE COLDREN | : : : : : : : | |
| | : | No. 119 MDA 2022 |

Appeal from the Order Entered December 16, 2021
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
0618-1783

BEFORE:   STABILE, J., McLAUGHLIN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:               **FILED: NOVEMBER 29, 2022**

Anne Coldren (Wife) appeals from the order of the Court of Common Pleas of Berks County Orphans' Court Division (Orphans' Court) revoking the probate of a will executed by her husband, Wilhelm Roscher (Decedent), on September 6, 2018 (the 2018 Will) on undue influence grounds.  Because there is no evidence in the record sufficient to show that Decedent suffered from a weakened intellect when he executed the 2018 Will, we reverse.

Decedent died from prostate cancer at age 89 on November 30, 2018, survived by Wife, by his only child, Cynthia Pearson (Daughter), a daughter from an earlier marriage, and by Daughter's adult son, Jeremy Poedel (Grandson).  Orphans' Court Decision at 1 & F.F. ¶¶9-10, 35-36, 175. Decedent lived in Pennsylvania and was a commercial airline pilot during his

_____

[*] Retired Senior Judge assigned to the Superior Court.

working life. *Id.* F.F. ¶3; N.T., 9/28/21, at 11. Decedent and Daughter's mother divorced when Daughter was a young child and Daughter and her mother moved to Arizona when Daughter was seven years old. Orphans' Court Decision F.F. ¶¶10-11. After that move, Daughter spent five weeks each summer with Decedent until age 17. *Id.* F.F. ¶12. As an adult, Daughter spoke with Decedent by telephone at least once a month, saw Decedent when Decedent traveled to Arizona, which he did most years, and at air shows in Wisconsin, and visited Decedent several times in Pennsylvania. *Id.* F.F. ¶¶13-14; N.T., 9/28/21, at 9, 14-15. Decedent and Wife met in 1997 and lived together for the last 20 years of Decedent's life, although they did not marry until December 2017. Orphans' Court Decision F.F. ¶¶18-21; N.T., 9/28/21, at 13-14, 81; N.T., 10/1/21, at 357-59.

Decedent executed a will on May 4, 2009 (the 2009 Will), in which he named Wife as executrix, made two $25,000 bequests to individuals unrelated to Wife's or Decedent's families, each of whom he described as "my faithful helper," divided his personal property and insurance proceeds equally between Wife, Daughter, and Grandson, directed that a great-granddaughter receive "any C.D. in her name," and devised the residue of his estate to Wife as executrix "to distribute such properties according to my wishes." Orphans' Court Decision F.F. ¶¶31-33; 2009 Will at 1-2, 5 (unnecessary capitalization omitted). In 2016 or 2017, Decedent was diagnosed with prostate cancer that had spread to his bones. Orphans' Court Decision F.F. ¶¶35-36. On April 29,

2017, Decedent executed a second will (the 2017 Will), which revoked the 2009 Will, removed the $25,000 bequests and reference to the great-granddaughter, but, like the 2009 Will, named Wife as executrix, divided his personal property and insurance proceeds equally between Wife, Daughter, and Grandson, and devised the residue of his estate to Wife as executrix "to distribute such properties according to my wishes." Orphans' Court Decision F.F. ¶¶39-42; 2017 Will at 1-2, 4.

In late spring 2017, Decedent became bedridden and was placed in hospice care. Orphans' Court Decision F.F. ¶¶45-46. Shortly before Memorial Day, Wife notified Decedent's family that he was near death and Daughter, Grandson and his wife, and Decedent's sister and her husband came to visit him. *Id.* F.F. ¶¶49-50. During this May and June 2017 period, Decedent exhibited some confusion and forgetfulness, accused Daughter, Grandson and his wife, and Decedent's sister and her husband of stealing documents from him, and made other strange statements. *Id.* F.F. ¶¶51-61; Hospice Care Notes 5/15/17, 5/30/17, 6/9/17, 6/13/17.

Decedent's health improved significantly in the fall of 2017, however, and he was removed from hospice care and was strong enough for a while to engage in some activities that he previously enjoyed, including on one occasion flying an airplane with a friend, Jeffrey Ivins, who jointly owned the plane with him. Orphans' Court Decision F.F. ¶¶28, 122-23. Decedent's friends who were in contact with him regularly in late 2017 and throughout

2018 did not observe confusion or disorientation after he left hospice care in the fall of 2017. Orphans' Court Decision at 33; N.T., 9/29/21, at 292-97, 301-05, 315-16; N.T., 9/28/21, at 54-58, 71-73. Decedent and Wife were married on December 9, 2017. Orphans' Court Decision F.F. ¶124.

On August 15, 2018, Decedent and Wife met with an attorney to have him draft a new will for Decedent. Orphans' Court Decision F.F. ¶¶138-45. At this meeting, Decedent advised the attorney that he wanted his estate to go to Wife, except for certain items of personal property, including artwork by Decedent's father and other items of family significance, which he wished to leave to Daughter and Grandson. *Id.* F.F. ¶¶143-45; Spang 9/16/21 Dep. 24-34, 37-38. The attorney prepared the 2018 Will in accordance with these instructions and, after receiving it and telling the attorney that it set forth what he wanted, Decedent executed the 2018 Will on September 6, 2018. Orphans' Court Decision F.F. ¶¶146-49; Spang 9/16/21 Dep. 34-36, 39-45. The 2018 Will revoked all prior wills, named Wife as executrix, bequeathed Decedent's father's artwork to Daughter and Grandson, an American Indian belt to Daughter, and a sword of Decedent's father and Decedent's Air Force ring to Grandson, and bequeathed the residue of Decedent's estate, including all of Decedent's real property, to Wife, if she survived him by more than 30 days, providing that if Wife did not survive him by 30 days, the residue of his estate was to go to Daughter and Grandson. 2018 Will at 2-4.

Decedent's physical health seriously declined in late September and October 2018, and he was again placed on hospice care on November 19, 2018. Orphans' Court Decision F.F. ¶¶153-54, 166-71; 9/27/18 Physician Progress Note; 10/26/18 Physician Progress Note; N.T., 10/1/21, at 387-88. On November 30, 2018, Decedent died. Orphans' Court Decision F.F. ¶175. The 2018 Will was admitted to probate on December 10, 2018. *Id.* F.F. ¶176. The value of the real property and other property left to Wife under the 2018 Will was more than $1 million and the value of the items of personal property bequeathed to Daughter and Grandson was $7,250. *Id.* F.F. ¶¶177-78; Pennsylvania Inheritance Tax Return at 2, Schedules E & J. In addition to the property passing through his estate, Decedent at death had an annuity of which Wife, Daughter, and Grandson were all 30% beneficiaries and Decedent's great-granddaughter was a 10% beneficiary, and Wife, Daughter, and Grandson each received $90,000 from that annuity. Pennsylvania Inheritance Tax Return, Schedule G; Wife's Answer to Appeal from Probate ¶42; Daughter's Reply to New Matter ¶42.

On April 16, 2019, Daughter filed an appeal from probate seeking to set aside the 2018 Will on grounds of undue influence.[1] The Orphans' Court held three days of hearings on Daughter's challenge to the 2018 Will on September

---

[1] In her appeal, Daughter also sought set the 2018 Will aside for lack of testamentary capacity, but later conceded that she could not show lack of testamentary capacity.

28 and 29, 2021 and October 1, 2021. At these hearings, the Orphan's Court heard testimony from Daughter, Wife, their respective psychiatrist expert witnesses, Dr. Panzer and Dr. Mechanick, Decedent's niece, two local friends of Decedent who saw him frequently, Ivins and Scott Harpel, and Decedent's accountant. In addition, the Orphans' Court received testimony by deposition from Decedent's sister, a third local friend of Decedent, Stephen Nichols, the attorney who drafted the 2018 Will, a witness to the 2018 Will, and the notary public who notarized the 2018 Will. Decedent's three wills, documents from the drafting of the 2018 Will, the probate record, Decedent's estate's Pennsylvania inheritance tax return, and some of Decedent's medical records were also admitted in evidence.

On December 15, 2021, the Orphans' Court issued a decision, entered December 16, 2021, finding that Daughter had shown by clear and convincing evidence that Decedent suffered from a weakened intellect, that Wife was in a confidential relationship with Decedent, and that Wife received a substantial benefit from the 2018 Will. Orphans' Court Decision at 23-39. Based on these findings and on the fact that Wife did not show absence of undue influence, the Orphans' Court revoked the probate of the 2018 Will on the ground that it was the product of undue influence by Wife. *Id.* at 38-40; Orphans' Court Order, 12/16/21. Wife timely appealed the Orphans' Court's revoking the probate of the 2018 Will.

Where, as here, the proponent of a will has established the proper execution of the will, the will may be set aside on the ground of undue influence only where the party challenging the will establishes all of the following three elements by clear and convincing evidence: 1) that the testator suffered from weakened intellect at the time that the will was executed; 2) that the testator was in a confidential relationship with the proponent of the will; and 3) that the proponent of the will received a substantial benefit under the challenged will. ***In re Estate of Byerley***, _ A.3d _, _, 2022 PA Super 181, slip op. at 29 (filed October 18, 2022); ***In re Estate of Nalaschi***, 90 A.3d 8, 14 (Pa. Super. 2014); ***In re Estate of Smaling***, 80 A.3d 485, 493, 497 (Pa. Super. 2013). If the party establishes each of these three elements, the burden shifts to the proponent of the will to produce clear and convincing evidence to demonstrate the absence of undue influence. ***Estate of Byerley,*** _ A.3d at _, 2022 PA Super 181, slip op. at 29; ***Estate of Nalaschi***, 90 A.3d at 14; ***Estate of Smaling***, 80 A.3d at 493. If the party challenging the will fails to show that the testator suffered from a weakened intellect at the time that he executed the will, the burden never shifts to the proponent of the will and the will cannot be set aside as the product of undue influence. ***Estate of Byerley,*** _ A.3d at _, 2022 PA Super 181, slip op. at 29-31.

Wife argues that the Orphans' Court erred in finding that Decedent suffered from a weakened intellect and in finding that she was in a confidential

relationship with Decedent. Our scope and standard of review of the Orphans' Court's findings concerning these elements is well established.

> In a will contest, the hearing judge determines the credibility of the witnesses. The record is to be reviewed in the light most favorable to appellee, and review is to be limited to determining whether the trial court's findings of fact were based upon legally competent and sufficient evidence and whether there is an error of law or abuse of discretion. Only where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence may the court's findings be set aside.

*Estate of Nalaschi*, 90 A.3d at 11 (quoting *In re Bosley*, 26 A.3d 1104 (Pa. Super. 2011)). Because we conclude that there was no competent evidence in the record that is sufficient to support the Orphans' Court's finding that Decedent suffered from a weakened intellect at the time that he executed the 2018 Will, its decision setting aside the 2018 Will for undue influence must be reversed and we therefore need not and do not address the issue of whether Daughter proved that Wife was in a confidential relationship with Decedent.

Although the weakened intellect necessary to permit a finding of undue influence is less than the degree of impairment that constitutes lack of testamentary capacity, proof of weakened intellect requires a showing of some significant mental impairment such as persistent confusion, forgetfulness, and disorientation. *Estate of Byerley,* _ A.3d at _, 2022 PA Super 181, slip op. at 20; *Estate of Fabian*, 222 A.3d 1143, 1050 (Pa. Super. 2019); *Owens v. Mazzei*, 847 A.2d 700, 707 (Pa. Super. 2004). The fact that the testator is terminally ill and physically weak when he executes the will is not sufficient to

show weakened intellect absent evidence that he was mentally impaired at that time or that those conditions caused him to suffer from mental impairment. ***In re Staico***, 143 A.3d 983, 986, 990 (Pa. Super. 2016) (weakened intellect not shown even though testator was hospitalized and so physically weak that he had difficulty signing his name at the time that he executed the will and testator died a week later, where there was no evidence from his treating doctors and nurses concerning his mental status or any other evidence that he suffered from persistent confusion, forgetfulness, or disorientation).

The Orphans' Court based its finding that Decedent suffered from a weakened intellect on the expert testimony of Daughter's expert, Dr. Panzer, and testimony and records concerning Decedent's behavior when he was on hospice care in 2017. Orphans' Court Decision at 24-27, 31-34. None of this evidence is sufficient to support a finding that Decedent suffered from a weakened intellect in when he executed the 2018 Will.

Dr. Panzer specifically testified that "I'm not saying that [Decedent] had a weakened intellect," that "the record does not demonstrate weakened intellect," that "I don't think we can directly comment on the presence or absence of weakened intellect," and that he was "unable to provide an opinion within a reasonable degree of medical certainty that on September 6, 2018, [Decedent] was suffering from weakened intellect." N.T., 9/29/21, at 171, 184, 187, 196, 211, 225. Dr. Panzer also admitted that he could not say that

Decedent suffered from a mental or other medical condition that would cause a weakened intellect or that medical treatments that he was receiving in 2018 caused him to be cognitively impaired. N.T., 9/29/21, at 189-90, 216-18, 223. To be competent to prove a fact, an expert's opinion must be to a reasonable degree of certainty; an opinion based on possibilities or even probability is not sufficient to constitute competent evidence. **McMahon v. Young**, 276 A.2d 534, 535 (Pa. 1971); **Nazarak v. Waite**, 216 A.3d 1093, 1111 (Pa. Super. 2019); **Griffin v. University of Pittsburgh Medical Center-Braddock Hospital**, 950 A.2d 996, 1000-04 (Pa. Super. 2008). Although he stated at the end of his testimony on direct examination that the conclusions to which he testified were "given within a reasonable degree of medical certainty," Dr. Panzer repeatedly made clear throughout his testimony that with respect to conditions and treatments that affect cognition, he was testifying only to possibilities and potential reasons that Decedent might have a weaken intellect, not to an opinion that such conditions existed. N.T., 9/29/21, at 171-72, 184, 186, 189-90, 194, 203, 216-19, 223-27, 229. Given Dr. Panzer's admissions that he could not say that Decedent suffered from a weakened intellect and his failure to testify to any opinion that Decedent suffered from a condition that impairs mental function that was based on more than mere possibilities, Dr. Panzer's testimony is woefully insufficient to support any finding that Decedent suffered from a weakened intellect.

This absence of competent expert testimony would not necessarily invalidate the Orphans' Court finding that the Decedent suffered from a weakened intellect at the time of the 2018 Will if there were other evidence in the record sufficient to support that finding. Weakened intellect may also be proven by lay witness testimony. *In re Mampe*, 932 A.2d 954, 960 (Pa. Super. 2007); *see also Estate of Nalaschi*, 90 A.3d at 12-13 (evidence of the testator's state of mind may be proved by lay witness testimony as well as by expert testimony). Here, there was some evidence of mental impairment when Decedent was on hospice care in 2017. Decedent's sister testified that in June 2017, Decedent made irrational accusations of theft and comments that were out of character. Gardner 9/20/21 Dep. 14-27, 35-36, 40, 43; Gardner 7/15/20 Dep. 20-25, 29-30. In addition, hospice records from his 2017 hospice treatment noted in May, June, and September 2017 that Decedent was "forgetful" or "forgetful at times" and on one occasion in May 2017 noted that Decedent was "confused" about his medical treatment. Hospice Care Notes 5/15/17, 5/30/17, 6/9/17, 6/13/17, 9/13/17.

All this evidence, however, concerned Decedent's condition approximately a year before the 2018 Will. Decedent's sister did not call Decedent after the end of June 2017 because she felt that he owed her an apology and she never spoke to or saw Decedent again. Gardner 9/20/21 Dep. 24-25, 28-29; Gardner 7/15/20 Dep. 30. The last medical record noting any forgetfulness or other cognitive impairment was from September 13,

2017. Hospice Care Notes 9/13/17. The other medical records that were introduced in evidence reported no cognitive impairment and described Decedent's mental status as fully alert and oriented. 9/27/18 Physician Progress Note at 2; 10/26/18 Physician Progress Note at 4.

There was also no evidence of any medical diagnosis of the cause of Decedent's mental issues in the late spring and summer of 2017 from which it can be inferred that those impairments would have continued. The medical records admitted in evidence contain no diagnosis of any long-term condition that would cause cognitive impairment. The only medical testimony, other than Dr. Panzer's legally insufficient opinions, was the testimony of Wife's expert, Dr. Mechanick, that Decedent did not suffer from a weakened intellect and that there was no basis to conclude that his treatment in 2018 or his medical condition would cause cognitive deficits. N.T., 9/29/21, at 242-48, 251-57, 279-83.

In contrast to the evidence concerning Decedent's metal condition in mid-2017, there were four witnesses found credible by the Orphans' Court who had contact with Decedent in 2018, Ivins, Harpel, Decedent's accountant, and the attorney who drafted the 2018 Will, and these witness did not find Decedent confused, disoriented, or irrational in the months leading up to the execution of the September 2018 Will or at the time of its execution. Orphans' Court Decision at 33. Ivins, who visited Decedent at least once a week throughout 2018, testified that he believed that Decedent was mentally

- 12 -

himself and showed no decline in his mental status until two weeks before his death. N.T., 9/29/21, at 292-97, 301-05, 315-16. Harpel, who visited Decedent once every three or four weeks in 2018, testified that Decedent was "fairly sharp" mentally, although he was physically weaker and more tired and talked less than before his illness. N.T., 9/28/21, at 54-58, 71-73. Decedent's accountant, who had known Decedent for over 10 years, testified that Decedent was "very sharp mentally" when he met with Decedent in March and April 2018 to prepare Decedent's taxes and that when he had lunch with Decedent on August 15, 2018 after Decedent met with the attorney concerning the preparation of the 2018 Will, Decedent walked a little slower, but there were no changes in Decedent's mental condition and Decedent was "very alert and aware." N.T., 10/1/21, at 329-32, 340-43. The attorney, who had also dealt with Decedent before his illness, testified that both when he met with Decedent in the summer of 2018 concerning the preparation of the 2018 Will and had lunch with him afterward and when Decedent executed the 2018 Will on September 6, 2018, Decedent was weaker than before his illness, but Decedent's intellect and personality were unchanged. Spang 9/16/21 Dep. 14-19, 23-28, 35, 43-52, 65-66.

Indeed, Daughter, who last saw Decedent in May 2017 but continued to speak to him by telephone at least once a month, testified that by September 2017, Decedent no longer believed the accusations he had made that she and Grandson had stolen documents. N.T., 9/28/21, at 14, 17-26, 34, 38-41.

- 13 -

Daughter testified that she did not observe any problems with Decedent's speech or memory, that she felt during the May 2017 visit that Decedent was "kind of distant" and not "totally as aware or as keen as he had in the past when he was younger," but that when she spoke to him after the May 2017 visit, Decedent sounded like his previous self. *Id.* at 28-30, 46-47. With respect to the September 2018 time period, Daughter testified only that Decedent was less talkative on the telephone. *Id.* at 34.[2]

Evidence of the testator's mental condition at times other than the date of execution of the will is more probative with respect to undue influence than it is with respect to testamentary capacity and can show weakened intellect at the time of the will that is sufficient to prove undue influence. *Estate of Fabian*, 222 A.3d at 1050-52; *Estate of Smaling*, 80 A.3d at 498. In cases where evidence from a period other than time of execution of the will has been found sufficient to prove undue influence, however, it was either established by medical testimony or undisputed that the testator suffered from a serious enduring medical condition that impairs cognition, and there was not merely

_____

[2] The remaining witnesses on whose testimony the Orphans' Court relied, Nichols and Decedent's niece, did not testify to observing mental impairment, let alone any impairment in 2018. Nichols, a local friend of Decedent's and Decedent's siblings, testified primarily concerning Wife's conduct, did not testify that he observed Decedent making any irrational, confused, or disoriented statements, and last saw Decedent in late 2017. Nichols Dep. 9-10, 23-28, 42. Decedent's niece last saw Decedent in June 2017 and her only testimony concerning Decedent's condition was that in late May 2017 and June 2017, Decedent was physically weak and did not talk much. N.T., 9/28/21, at 119-20, 125-27, 129.

lay testimony that the testator had an unexplained prior period of confused or irrational behavior followed by a lengthy period closer to the will's execution in which no cognitive impairment was observed. **Fabian**, 222 A.3d at 1148 (physician who evaluated testatrix upon admission to personal care home two months before will was executed diagnosed her as suffering from moderate to severe Alzheimer's disease); **Smaling**, 80 A.3d at 495, 498 (testator's primary care physician had diagnosed the testator as suffering from dementia before will was executed); **In re Mampe**, 932 A.2d at 960-62 (no dispute that that testatrix suffered from Alzheimer's disease); **Owens**, 847 A.2d at 707-708 (two physicians opined that decedent suffered from progressive dementia). **Compare Estate of Nalaschi**, 90 A.3d at 12-15 (no showing of weakened intellect based on testator's confused and forgetful behavior and false theft accusations one year to six months before the will where there was also evidence that the court found credible that testator was lucid in the two months before the will's execution). Here, given the absence of evidence that the behavior of Decedent in the summer of 2017 was due to a condition that was present a year later in 2018 and the evidence that the Orphans' Court found credible that no significant mental impairment was observed in 2018, no inference can reasonably be drawn from the 2017 evidence that Decedent suffered from a weakened intellect when the will was executed.

Because there was no competent evidence sufficient to support a finding that Decedent suffered from a weakened intellect when he executed the 2018

Will, Daughter failed to prove all three elements required to set aside the 2018 Will on grounds of undue influence. We therefore reverse the Orphans' Court's order revoking probate of Decedent's September 6, 2018 Will and remand with instructions to reinstate the probate decree of the Berks County Register of Wills admitting Decedent's September 6, 2018 Will to probate.

Order reversed. Case remanded with instructions to reinstate the probate decree of the Berks County Register of Wills admitting the September 6, 2018 Will of Wilhelm Roscher to probate. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/29/2022